# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| JASON SETH PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-02320-TWP-TAB |
| | ) | |
| KIM HOBSON, NURSE TAGGART, | ) | |
| SAMUEL BYRD, REGINA ROBINSON, | ) | |
| and LISA WOLFE, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff Jason Perry ("Mr. Perry"), an inmate at the Wabash Valley Correctional Facility ("WVCF"), brings this action pursuant to 42 U.S.C. § 1983 alleging that the Defendants exhibited deliberate indifference to his need for treatment for gastroesophageal reflex disease ("GERD") in violation of his Eighth Amendment rights and retaliated against him for filing grievances. The Defendants move for summary judgment arguing they were not deliberately indifferent to the Mr. Perry's medical needs and are therefore entitled to judgment as a matter of law. (Dkt. 117). In response, Perry submitted a series of cross-motions for summary judgment. (Dkt. 123, Dkt. 140, Dkt. 145). For the following reasons the Defendants' Motion for Summary Judgment is **granted in part and denied in part** and Perry's Motions for Summary Judgment are **denied**.

# I.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.   Federal Rule of Civil Procedure 56(c)(1)(A). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016).  "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events.  *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717

(7th Cir. 2018).   It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the court is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them.  *Grant v. Trustees of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017).  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Anderson*, 477 U.S. at 255.

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made.  *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)).  The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact.  *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II.   <u>BACKGROUND</u>

The following statement of facts was evaluated pursuant to the standards set forth above. The facts are considered undisputed except to the extent that disputes are noted.

### A.   <u>The Defendants</u>

Samuel Byrd, ("Dr. Byrd"), is a physician licensed to practice medicine in the State of Indiana. During all times relevant to the Complaint, and currently, Dr. Byrd is employed by Wexford of Indiana, LLC ("Wexford") as a physician at WVCF.  (Dkt. 119-1 ¶ 2.)

Lesa Wolfe, ("Ms. Wolfe"), is a nurse licensed to practice in the State of Indiana.  (Dkt. 119-2 ¶ 1.)  During all times relevant to the Complaint, she was employed by Wexford as a nurse at WVCF.  *Id.* ¶ 2.  One of Ms. Wolfe's responsibilities included the review of medical orders and

the disbursement of medications, as well as the ordering of medications from the off-site pharmacy.  (Dkt. 119-2 ¶ 3.)

Aimee Taggart, ("Ms. Taggart"), is a nurse licensed to practice in the State of Indiana. (Dkt. 119-3 ¶ 1.) During all times relevant to the Complaint, she was employed as a nurse by Wexford at WVCF. *Id.* ¶ 2. As a nurse, Ms. Taggart would often be responsible for passing medication in the housing units.  (Dkt. 119-3 ¶ 4.)

Kim Hobson, ("Ms. Hobson"), is a nurse licensed to practice medicine in the State of Indiana.  (Dkt. 119-4 ¶ 1.) During all times relevant to the Complaint, she was employed by Wexford as the Health Services Administrator ("HSA") at WVCF.  (Dkt. 119-4 ¶ 2.)  As the HSA, Ms. Hobson's job duties and responsibilities are primarily administrative. *Id.* ¶ 3. Ms. Hobson supervises the provision of health care, ensures that patients receive access to the care they need, and works to ensure compliance by the medical staff with institutional policies and directives.  *Id.* Another of Ms. Hobson's responsibilities is reviewing health care grievances submitted by patients at WVCF and providing feedback and insight to the grievance officer.  *Id.* ¶ 4.

Regina Robinson, ("Ms. Robinson"), is a nurse licensed to practice medicine in the State of Indiana.  (Dkt. 119-5 ¶ 1.)  During all times relevant to the Complaint, she was employed by Wexford as the Director of Nursing at WVCF.  *Id.* ¶ 2.  One of her responsibilities was to periodically review health care requests or grievances submitted by inmates at WVCF.  *Id.* ¶ 3. Ms. Robinson no longer works for Wexford or at WVCF.  *Id.* ¶ 2.

**B.    <u>Mr. Perry's Treatment</u>**

Mr. Perry arrived at WVCF on or around August 22, 2017.  (Dkt. 119-1 ¶ 4.)  Before his transfer to WVCF, he was incarcerated at the New Castle Correctional Facility ("NCCF").  While

at NCCF, he had been diagnosed with mild GERD and prescribed Zantac 300 mg.  (Dkt. 119-1 ¶ 5.)

On or around September 6, 2017, Mr. Perry submitted a health care request indicating that he was not receiving Zantac for his GERD.  (Dkt. 119-2 ¶ 6; Dkt. 119-6 at 9.)  Ms. Wolfe reviewed the chart and noted in response to his health care request that he did not have an order for Zantac at that time, but instead his prescription had been changed to Pepcid, and that he had a current order to receive Pepcid.  *Id.*  While this substitution was made and noted in the administration records, there are some documents that reference a similar ongoing prescription of Zantac.  (Dkt. 119-1 ¶ 18; Dkt. 128 ¶ 32; Dkt. 123-1 at 193 (November 9, 2017, chart update showing Zantac prescription).)

According to Dr. Byrd's review of the records, on or around September 6, 2017, a medication administration record was created showing that Mr. Perry was going to receive Pepcid as a therapeutic substitution for the previously prescribed Zantac and Mr. Perry was given Pepcid as of September 6, 2017.  (Dkt. 119-1 ¶ 8; Dkt. 119-6 at 5 (medication administration record stating prescription for Zantac and "(Pepcid 40 mg therapeutic sub)").)  Dr. Byrd does not specifically recall any conversations or meetings during this time, but believes that he may have been approached by a member of nursing staff and asked if Pepcid could be utilized as a substitution for Zantac, as they do not normally keep Zantac in stock at WVCF.  *Id.* ¶ 9.  Instead, patients that require treatment with an H2 blocker are most often prescribed Pepcid.  *Id.*  H2 blockers are a group of medications that reduce the amount of acid produced by the cells in the lining of the stomach.  *Id.* ¶ 7.  H2 blockers are an approved treatment for patients suffering symptoms related to GERD.  *Id.*  Zantac and Pepcid are both medications that fall in the class of H2 blockers used to treat GERD and are often used as substitutes for each other when providing treatment.  *Id.*  Dr.

Byrd believes that the substitution of Pepcid for Zantac on or around September 6, 2017, was reasonable. *Id.* ¶ 9.

Pepcid was originally administered in individual doses and was eventually provided to Perry, as a "KOP" (keep on person) medication that he could take as needed. (Dkt. 119-1 ¶ 10.)

Mr. Perry was admitted into segregation in early September and his KOP Pepcid was taken based on prison policy. (*See* Dkt. 123-1 at 21; Dkt. 124 at 18.) Ms. Taggart passed Mr. Perry's Pepcid to him during September. (Dkt. 123-1 at 43-44.) But between September 27 and September 30, 2017, the medical records reflect that Pepcid was not available. *Id.* In addition, Ms. Taggart initialed the medication administration record on the days of October 4, 5, 9, and 10, 2017 that the medicine was not available. (Dkt. 123-1 at 44, 189.)

On September 30, 2017, Mr. Perry submitted a health care request, stating that he was not receiving his Pepcid for symptoms related to GERD. (Dkt. 119-2 ¶ 7.) Ms. Wolfe reviewed the medical records and noted that the medical department had ordered and received Pepcid 30 tablets on September 14, 2017, and, therefore, there was medication on-site to be dispensed to Mr. Perry. Dkt. 119-2 ¶ 7.

On October 2, 2017, Mr. Perry submitted an informal request for interview directly to Ms. Robinson, the Director of Nursing. (Dkt. 119-5 ¶ 4.) He stated:

> I am being denied my chronic care medicine for GERD. I have been told Saturday 9-30-17 that I did not have an order for Zantac. I was told tonight 10-2-17 I have an order for Zantac now. I have not received medication for GERD since 9-26-17 and it's now 10-02-17. This is [a] denial of medical care.

(Dkt. 119-6 at 11.) Upon reviewing Mr. Perry's medical records, Ms. Robinson concluded that he had an active prescription for Zantac 300 mg at night and that prescription was good through January 21, 2018. (Dkt. 119-5 ¶ 4.) Ms. Robinson also instructed Mr. Perry to submit a health care request seeking a refill of any medication if he was not receiving it. *Id.* Based upon Ms.

Robinson's review of the medical records, it appeared that a substitution was made of Mr. Perry's Zantac for Pepcid. *Id.* ¶ 7. These medication administration records, however, are not normally part of the electronic medical record. *Id.* Therefore, when she reviewed Mr. Perry's electronic medical record, she saw the active prescription for Zantac, which was the basis for her response to the request for interview form. *Id.*

At the time that Ms. Robinson responded to Mr. Perry's grievance, she was not aware of any prior lawsuits or grievances filed by Mr. Perry. *Id.* ¶ 9. Her response to Mr. Perry's informal request for interview was not based upon or motivated by any prior lawsuits or grievances that Mr. Perry had filed. *Id.* In fact, responding to informal requests for interviews or grievances was part of her standard responsibilities. *Id.*

On October 11, 2017, Ms. Taggart wrote an email to Ms. Wolfe, notifying her that Mr. Perry told Ms. Taggart that he was not receiving his Zantac, and that the medication needed to be refilled. (Dkt. 119-3 ¶ 6; Dkt. 119-6 at 10.) The medical records reflect that Mr. Perry received a sixty-day supply of Pepcid on October 12, 2017. (Dkt. 119-3 ¶ 7.)

At the time Ms. Taggart interacted with Mr. Perry in September and October 2017, she had no knowledge regarding any prior lawsuits or grievances filed by Mr. Perry. (Dkt. 119-3 ¶ 9.) To Ms. Taggart's knowledge, Mr. Perry had never previously filed a lawsuit against her, and she is not involved in the grievance process, and therefore she rarely has knowledge regarding grievances that are filed by inmates. *Id.*

When Ms. Wolfe reviewed Mr. Perry's medical records and health care requests in September and October 2017, she was not aware of any grievances or lawsuits filed by Mr. Perry. (Dkt. 119-2 ¶ 12.)

The medication administration records show that Mr. Perry was given 60 Pepcid pills to take as needed on October 12, 2017 and was again administered 60 pills on November 16, 2017. (Dkt. 119-1 ¶ 10.)

According to the medical records, on or around November 17, 2017, Dr. Byrd entered an order in the medical chart for Mr. Perry to continue receiving Pepcid for treatment of his GERD. (Dkt. 119-1 ¶ 11.)

At some point in late November or early December 2017, the grievance specialist at WVCF contacted Ms. Hobson regarding a grievance that Mr. Perry had submitted about concerns over his prescriptions for Zantac and Pepcid. (Dkt. 119-4 ¶ 5.) The grievance stated in part:

> I wrote a healthcare request on 09-30-17 letting medical staff know I have not been getting my chronic medication for GERD for 3 days at that time. Pharmacy wrote back stating that my Pepcid was filled on 09-14-17 for 1 a night at 30 tabs so on 09-26-17 my meds should not have stopped. I showed Nurse Taggart my healthcare request which says my Pepcid is filled for my chronic care situation but she became argumentative and said it doesn't matter cause I don't got it. Just because I got my medication after 2 weeks of suffering without it does not take away the fact that I was denied medical care with deliberate indifference. This informal says Zantac but I don't get Zantac cause of financial reasons and was given Pepcid on 10-11-17 after leaving segregation and coming to population on 10-10-17.

(Dkt. 123-1 at 6.) Ms. Hobson reviewed the relevant medical records and informed the grievance specialist that, pursuant to Wexford's direction, the pharmacies prescribed Pepcid as an H2 blocker, instead of Zantac, as these medicines can be therapeutically interchanged. (Dkt. 119-4 ¶ 5.) If a patient preferred Zantac, Zantac would be available for purchase at the institutional commissary but that the pharmacy on-site would not, as a matter of course, keep Zantac in stock. *Id.* Ms. Hobson was able to confirm in the medical records that Mr. Perry was receiving Pepcid for his complaints of GERD. *Id.*

According to Dr. Byrd's records, he did not first see Mr. Perry for an assessment and treatment until December 28, 2017. (Dkt. 119-1 ¶ 6.) That day, Dr. Byrd evaluated Mr. Perry

after he had complained of nearly fainting due to what he believed was low blood sugar. *Id.* ¶ 12. They discussed these episodes, and Dr. Byrd's review of his recent labs, which showed normal blood sugar readings. *Id.* Mr. Perry also brought up his prescription for Pepcid and reported that he was no longer having heartburn at night. *Id.* He specifically requested that the Pepcid be discontinued, and Dr. Byrd discontinued the prescription for Pepcid. *Id.* Mr. Perry also informed Dr. Byrd during this visit of his frustration, stating that he believed he was getting less than ideal medical care and was being ignored because he was an inmate. *Id.* Dr. Byrd assured Mr. Perry that was not the case. *Id.*

It was never brought to Dr. Byrd's attention that Mr. Perry was missing dosages or was not receiving medications as had been ordered. *Id.* ¶ 19. Typically, Dr. Byrd relies upon nursing staff to note incoming orders and to ensure medication is dispensed to patients as ordered. *Id.*

On January 12, 2018, Mr. Perry was transferred back to NCCF. *Id.* ¶ 13. Dr. Byrd was not involved in Mr. Perry's care from that day until he transferred back to WVCF. *Id.* More recently, it was brought to Dr. Byrd's attention that during his most recent time at WVCF, Mr. Perry's cell was searched, and he was discovered with multiple medication cards of Pepcid that had been administered, but he was not taking. *Id.* ¶ 14. The excess medication was therefore confiscated. *Id.*

In early March 2018, the grievance specialist contacted Ms. Hobson regarding a grievance Mr. Perry filed before he was transferred to NCCF, alleging that he was not receiving medication for GERD as ordered by his doctor. (Dkt. 119-4 ¶ 6.) This grievance stated:

> I never asked or complained about the medicine not working. There is no reason for Dr. Byrd to order me medicine twice a day. There is not any type of reason to double my medication. I did not have this happen until I came to lockup or segregation. I can only think it as retaliation since I have a grievance in now on the same medication but for not getting it at all for over two weeks. To give me medicine that I did not ask for and change my order for no reason is a violation.

(Dkt. 123-1 at 10.)  Ms. Hobson responded: "The medication has always been ordered as Pepcid 40 mg 2x a day." *Id.* at 11.[1]  Ms. Hobson's responses to these grievances were not based upon or influenced by any prior grievances or lawsuits that had been filed by Mr. Perry.  *Id.* ¶ 9.  Instead, her responses were based upon the information that was available to her, as well as based upon her review of Mr. Perry's medical chart.  *Id.* ¶ 9.

## III.  DISCUSSION

The parties seek summary judgment on Mr. Perry's retaliation and deliberate indifference claims which will be discussed in turn.

## A.  Retaliation

Mr. Perry contends that the Defendants retaliated against him.  To prevail on his First Amendment retaliation claim, a plaintiff must show that "(1) []he engaged in activity protected by the First Amendment; (2) []he suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity []he engaged in was at least a motivating factor for the retaliatory action." *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017) (internal citations omitted).

---

[1] Mr. Perry argues that Ms. Hobson lied under oath when she answered an interrogatory because she stated that she had not signed any sworn statements because she had signed this grievance response under oath. Ms. Hobson's grievance response apparently was signed under penalties for perjury. (Dkt. 128-1 at 157.) But even if Ms. Hobson made a false statement in her Interrogatories, the Court cannot weigh her credibility at summary judgment. *Miller*, 761 F.3d at 827. Further, Mr. Perry contends that her statement in the grievance response that his medication has always been ordered as Pepcid is false because he had been on Zantac since November 30, 2016. But the evidence before the Court, viewed in the light most favorable to Mr. Perry is that Zantac was ordered for him before he arrived at WVCF, but that during his time at WVCF, Mr. Perry's order was for Pepcid, twice a day, not Zantac. One interpretation of Ms. Hobson's statement is that Mr. Perry had been prescribed Pepcid during the time he was at WVCF, which is an accurate factual statement.

Mr. Perry filed grievances about his medical care in late November or early December 2017 and early March 2018.  (Dkt. 119-4 ¶¶ 4, 6.)  These grievances satisfy the first element of a retaliation claim because they are protected First Amendment activity.  *Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016) ("[g]rievances addressed to a government agency are, if intelligible, nonfrivolous, and nonmalicious, petitions for the redress of grievances within the meaning of the First Amendment and are therefore prima facie protected by the amendment.").

But Ms. Wolfe, Ms. Taggart, and Ms. Robinson have each testified that they were not aware of any grievances or lawsuits filed by Mr. Perry when they responded to his concerns regarding his health care.  Dkt. 119-2 ¶ 12 (Ms. Wolfe was not aware of any grievances or lawsuits when she considered Mr. Perry's health care requests); Dkt. 119-3 ¶ 9 (Ms. Taggart was not aware of any grievances or lawsuits when she spoke to Mr. Perry about his medication); Dkt. 119-5 ¶ 9 (Ms. Robinson was not aware of any grievances or lawsuits at the time she responded to his informal request for interview). Mr. Perry has not presented any evidence to dispute these assertions.  In addition, there is no evidence that Dr. Byrd knew about any grievance or lawsuit by Mr. Perry when he was evaluating his medications or otherwise providing him treatment.  Mr. Perry therefore has failed to meet the elements of a retaliation claim against these Defendants because he cannot show that his First Amendment activity was a motivating factor in any of their actions. *Cf. Daugherty*, 906 F.3d at 610 (affirming grant of summary judgment when inmate presented only "vague and confusing testimony that [the inmate], at some point, named [the defendant] in a grievance" but "no evidence about what the grievance said or whether [the defendant] even saw or knew about it.").[2]

---

[2] Mr. Perry asserts that when he complained to Ms. Taggart about not receiving his medications, she told him to "stay out of segregation if you want your medication." (Dkt. 128, at 25.) But Mr. Perry being in segregation is not a protected First Amendment activity. Thus, even if Ms. Taggart did base her actions on his presence in segregation, this does not show that she retaliated against him in violation of his First Amendment rights.

Ms. Hobson knew about Mr. Perry's grievances because she helped respond to them.  (Dkt. 119-4 ¶ 5.)  But he still has not shown that her actions were retaliatory.  To show that Ms. Hobson's actions were retaliatory, Mr. Perry must show that retaliatory animus was at least a "motivating factor" in her actions.  *May v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013).  This "can . . . be demonstrated by suspicious timing alone only when the . . . action follows on the close heels of protected expressions."  *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019).  But even if Mr. Perry can demonstrate that retaliatory animus was a motivating factor in Ms. Hobson's actions, this is not enough to establish retaliation as a matter of law.  Instead, "[t]he burden then shifts to the defendants to show that they would have taken the action despite the bad motive."  *May*, 719 F.3d at 635.  In other words, Ms. Hobson can rebut Mr. Perry's *prima facie* case of retaliation "by showing that [her] conduct was not a necessary condition of the harm – the harm would have occurred anyway."  *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011).  If Ms. Hobson can establish a non-retaliatory motive for the allegedly retaliatory action, Mr. Perry must "produce evidence upon which a rational finder of fact could infer that these explanations were lies."  *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006).

Here, Ms. Hobson's responses to Mr. Perry's grievances necessarily followed close on the heels of his filing of those grievances, so a reasonable jury might conclude that retaliation was a motivating factor in her actions.  *See Daza*, 941 F.3d at 309.  But Ms. Hobson argues she would have taken the same actions whether or not she was motivated by retaliation because she responded to his grievances based on her review of his chart.  (Dkt. 119-4 ¶ 4.)  In response to Mr. Perry's grievance filed in November or December, she reviewed the relevant medical records and informed the grievance specialist that, at Wexford's direction, the pharmacies were prescribing

---

Pepcid as an H2 blocker instead of Zantac, and that these medicines could be therapeutically interchanged.  (Dkt. 119-4 ¶ 5.)  She also confirmed that Mr. Perry had an active prescription for Pepcid.  *Id.*  The grievance specialist contacted Ms. Hobson again in early March 2018 after Mr. Perry had filed a grievance alleging that he was not receiving his GERD medication as ordered.  *Id.* ¶ 6.  Ms. Hobson reviewed the medical records which indicated that following his transfer to WVCF, his order for Zantac was substituted with an order for Pepcid.  *Id.*  Ms. Hobson confirmed that Mr. Perry had a prescription for Pepcid since he had arrived at WVCF.  *Id.*

In short, Ms. Hobson simply reviewed Mr. Perry's grievances and responded to them based on his medical records.  She therefore has shown that her actions would have been the same regardless of whether she was motivated by retaliatory animus against Mr. Perry.  *See Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) ("[T]he ultimate question is whether events would have transpired differently absent the retaliatory motive.").  Here, Mr. Perry has produced no evidence to show that her purported reasons for responding to the grievances in the manner she did are merely pretextual.  Accordingly, like the other Defendants, Ms. Hobson is entitled to summary judgment on Mr. Perry's retaliation claim.

## B.     <u>Eighth Amendment</u>

Mr. Perry also asserts Eighth Amendment medical care claims against the Defendants.  To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).

> [C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)).  "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).  *See Plummer v. Wexford Health Sources, Inc.*, 609 F. App'x 861, 862 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments").  In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).  "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

The Defendants do not appear to dispute for purposes of summary judgment that Mr. Perry's GERD is a serious medical condition, but the parties do dispute whether the Defendants

were deliberately indifferent to this condition. The care each Defendant provided to Mr. Perry will be discussed in turn.

### 1.   **Dr. Byrd**

In support of his motion for summary judgment, Dr. Byrd argues that, while it appears that he approved the substitution of Pepcid for Zantac to treat Mr. Perry's GERD, this substitution was reasonable and that he was not otherwise aware that Mr. Perry was not receiving his medications. Mr. Perry argues that because he had a prescription for Zantac when he arrived at WVCF, his prescription should not have been changed to Pepcid.

The Defendants have provided evidence that Pepcid is an appropriate substitute for Zantac. Thus, even if Dr. Byrd did substitute Mr. Perry's Zantac prescription with Pepcid, Mr. Perry cannot show that Dr. Byrd disregarded an excessive risk to Mr. Perry.   Mr. Perry argues that the substitution of Pepcid for Zantac amounts to an interference with medication already prescribed to him, but Dr. Byrd, as his physician, can change the prescription even if another physician prescribed him a different medication.   *Cf. Pyles*, 771 F.3d at 409.   This is the case even though, as Mr. Perry argues, there is an Indiana Department of Correction policy regarding the transfer of medications when an inmate is transferred between prisons because the violation of a prison policy does not necessarily equate to a violation of the Eighth Amendment.[3] *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) ("[s]ection 1983 protects against 'constitutional violations, not violations of . . . departmental regulation and . . .  practices[.]'") (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)).   Mr. Perry also argues that Zantac and Pepcid are not as effective for GERD as other medications, but it is undisputed that Zantac and Pepcid are both H2 blockers

---

[3] In addition, to the extent that Mr. Perry argues that he experienced a delay in receiving his medication between the time he arrived at WVCF on August 22, 2017, and the filing of his first health care request on September 6, 2017, and that this delay amounted to an interference with his medications, he has not provided any evidence that any of the Defendants were aware of or responsible for this delay.

used to treat GERD, and there is no evidence that Dr. Byrd knew that Pepcid was not effectively treating Mr. Perry's symptoms.

Mr. Perry also argues that because Dr. Byrd later told him that he could order Zantac to treat his GERD, his failure to provide him with Zantac earlier amounts to deliberate indifference. (Dkt. 140-1.)  But this is not enough to show that, by prescribing Pepcid instead of Zantac, Dr. Byrd violated Mr. Perry's Eighth Amendment rights because Dr. Byrd has testified that Pepcid is an appropriate substitute for Zantac and Mr. Perry has presented no evidence to refute this.  In addition, there is no evidence that Dr. Byrd was aware at any time that Mr. Perry was not receiving his medication or that Pepcid was not providing Mr. Perry with relief from his GERD.  If he was not aware of a risk to Mr. Perry, he cannot be found to have disregarded a risk.  *See Lucio v. Santos*, 600 F. App'x 480, 482 (7th Cir. 2015) (to succeed on deliberate indifference claim, plaintiff needed evidence that the doctor was aware of and did not correct medical staff's failure to fill the plaintiff's prescription) (citing *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011)).

In short, Dr. Byrd has shown that he did not disregard an excessive risk to Mr. Perry's health.  Dr. Byrd is therefore entitled to summary judgment on Mr. Perry's claims against him and Mr. Perry is not entitled to summary judgment.

## 2.   Ms. Wolfe

Ms. Wolfe argues that she was not deliberately indifferent to Mr. Perry's serious medical needs because she reviewed his health care requests and responded to them properly.  When she received his informal request on September 6, 2017, stating that he was not receiving Zantac, she responded that he had a prescription for Pepcid, and he received Pepcid the next day.  (Dkt. 119-2 ¶ 6; Dkt. 119-6 at 5.)  As already discussed, the record reflects that Pepcid was an appropriate substitute for Zantac. When Mr. Perry complained in late September of 2017 that he was not

receiving his medication, Ms. Wolfe reviewed the medical records available to her and concluded that he had an order for Pepcid. (Dkt. 119-2 ¶ 7.) Then, when Ms. Taggart notified her that Mr. Perry was out of Pepcid on October 10, 2017, he received his medication the following day. (Dkt. 119-2 ¶ 8.) Given the fact that Mr. Perry apparently did not receive his Pepcid between September 27, 2017 and October 11, 2017, one might conclude that she should have investigated his September 30, 2017, informal request further. Her failure to do so may amount to negligence, but the record does not lead to the conclusion that it rose to the level of deliberate indifference. *See Arnett*, 658 F.3d at 758. Based on these facts, no reasonable jury could find that Ms. Wolfe was deliberately indifferent to Mr. Perry's serious medical needs. Accordingly, she is entitled to summary judgment on his Eighth Amendment claim.

### 3. **Ms. Taggart**

Ms. Taggart argues that she was not deliberately indifferent to Mr. Perry's serious medical needs because she emailed Ms. Wolfe notifying her that he was not receiving his medication and he needed a refill. Mr. Perry contends that when his Pepcid ran out on September 26, 2017, it was Ms. Taggart's duty to notify the pharmacy and immediately obtain a refill and instead she waited until October 11, 2017 to do so. Ms. Taggart knew on September 27, 2017, that there was no Pepcid to give Mr. Perry as ordered by the doctor, but there is no designated evidence that Ms. Taggart attempted to obtain a refill for Mr. Perry for two weeks. A reasonable jury might or might not conclude that this delay amounted to deliberate indifference. Accordingly, neither Ms. Taggart nor Mr. Perry are entitled to summary judgment on Mr. Perry's deliberate indifference claim.

17

### 4.  Ms. Hobson

Ms. Hobson seeks summary judgment on Mr. Perry's claims arguing that her responses to his grievances were appropriate.  Mr. Perry argues that, as the HSA, Ms. Hobson was responsible for ensuring that he received his medication.

At some point in late November or early December 2017, the grievance specialist at WVCF contacted Ms. Hobson regarding a grievance submitted by Mr. Perry regarding his GERD medication. (Dkt. 119-4 ¶ 5.)  Ms. Hobson informed the grievance specialist that pursuant to direction from Wexford and the regional pharmacy team, pharmacies were prescribing Pepcid as an H2 blocker instead of Zantac, and that these medicines could be therapeutically interchanged. *Id*.  However, if a patient preferred Zantac, it would be available for purchase at the institutional commissary, and Zantac would not be normally stored at the institutional pharmacy.  *Id.*  She also confirmed that Mr. Perry had an active prescription for Pepcid.  *Id.*  There is no evidence that Mr. Perry was not receiving Pepcid at this time.

Ms. Hobson was contacted again by the grievance specialist in early March 2018, after Mr. Perry had filed a grievance alleging he was not receiving medications for GERD as ordered.  *Id.* ¶ 6.  Ms. Hobson reviewed the medical records which indicated that following his transfer to WVCF, a substitution of the prior order of Zantac was made and that instead he was receiving Pepcid.  *Id.*

Based on these facts, Ms. Hobson is entitled to summary judgment on Mr. Perry's claims. It is undisputed that Pepcid is a reasonable replacement for Zantac so there is no evidence that her responses to his grievances were inappropriate.  In addition, she received his first grievance after his prescription had been refilled and his second grievance complained not that he was not receiving the medication, but that he was receiving it twice a day.  Ms. Hobson responded simply

that the order was for Pepcid twice a day.  There is no evidence that Ms. Hobson was aware at any time that Mr. Perry was not receiving his medication.  She is entitled to summary judgment on his claims.  This is the case even if, as Mr. Perry argues, Ms. Hobson violated prison policy in some way.  *See Estate of Simpson*, 863 F.3d at 746.

     **5.**     **Ms. Robinson**

Ms. Robinson seeks summary judgment on Mr. Perry's claims arguing that she responded to his informal request based on the information available to her at the time.

On October 2, 2017, Mr. Perry submitted an informal request to Ms. Robinson stating that he was not receiving medication for GERD.  Upon reviewing Mr. Perry's medical records, Ms. Robinson concluded that he had an active prescription for Zantac 300. (Dkt. 119-5 ¶ 4.) Ms. Robinson also instructed Mr. Perry to submit a health care request seeking a refill of any medication if he was not receiving it.  *Id.*  Ms. Robinson acknowledges that this response was incorrect because the medication administration records showed a substitution of Pepcid for Zantac at the time of Mr. Perry's informal request. She states, however, that these medication administration records are not normally part of the electronic medical record.  *Id.*  Therefore, when she reviewed Mr. Perry's electronic medical record, she saw the active prescription for Zantac, which was the basis for her response to the request for interview form.  *Id.*

Like Ms. Wolfe's response to Mr. Perry's concerns, Ms. Robinson's response amounts to negligence at most.  *See Arnett*, 658 F.3dd at 758.  The errors in Mr. Perry's medical records do not amount to deliberate indifference.  Based on these facts, no reasonable jury could find that Ms. Robinson was deliberately indifferent to Mr. Perry's serious medical needs.  Accordingly, she is entitled to summary judgment on his Eighth Amendment claim.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' Motion for Summary Judgment, (Dkt. [117]), is **GRANTED in part and DENIED in part**. Mr. Perry's Cross-Motion for Summary Judgment, (Dkt. [123]), and Supplemental Cross-Motion for Summary Judgment, (Dkt. [127]), are **DENIED**. The Defendants are entitled to summary judgment on Mr. Perry's retaliation claims and those claims are **dismissed**.  In addition, Dr. Byrd, Ms. Wolfe, Ms. Hobson, and Ms. Robinson are entitled to summary judgment on Mr. Perry's Eighth Amendment claims.  The **Clerk shall terminate** Dr. Byrd, Ms. Wolfe, Ms. Hobson, and Ms. Robinson as defendants on the docket.  The Defendants' Motion for Summary Judgment is **DENIED** as to Mr. Perry's deliberate indifference claims against Ms. Taggart.

Further, Mr. Perry's motions to supplement cross-motion for summary judgment, (Dkt. [140], and Dkt. [145]), are **GRANTED** to the extent that the Court has considered the evidence and argument presented in those motions.  Similarly, the Defendants' motion for leave to file a belated response, (Dkt. [133]), is **GRANTED**.

The claims against Ms. Taggart shall proceed to a settlement conference or trial if one is necessary.  If Mr. Perry wishes to request that the Court attempt to recruit counsel to represent him for these proceedings, he should file a motion on the Court's form.  The **Clerk shall** include a form motion for assistance with recruiting counsel with Mr. Perry's copy of this Order.

**SO ORDERED.**

Date: 6/4/2020

_Tanya Walton Pratt_

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jason Seth Perry, #138925
Wabash Valley Correctional Facility
WVCF - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com